# Dennis Wayne Eaton

## v.

# Commonwealth of Virginia

Record Nos. 900238 and 900239

September 21, 1990

Present: All the Justices

*Thomas M. Blaylock; Anthony F. Anderson* for appellant.
*Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

On appeal, we review the capital murder conviction and death sentence imposed upon Dennis Wayne Eaton for the murder of Virginia State Master Trooper Jerry L. Hines.

## I. PROCEEDINGS

On May 1, 1989, Eaton was indicted by a Rockbridge County grand jury for capital murder under former Code § 18.2-31(f), now Code § 18.2-31(6),[1] and for the use of a firearm in the commission of a felony under Code § 18.2-53.1. On Eaton's motion, the venue was changed to Fauquier County. At the conclusion of the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury convicted Eaton of both offenses. The jury fixed his punishment at imprisonment for two years on the firearm conviction. At the penalty phase of the trial, after hearing evidence in aggravation and mitigation, the jury fixed Eaton's punishment at death for capital murder, based upon his "future dangerousness." After reviewing the post-sentence report, the trial court, on January 10, 1990, entered final judgments confirming the two convictions and imposing the penalties fixed by the jury.

We have consolidated the automatic review of Eaton's death penalty with his appeal of the capital murder conviction in Record No. 900238, Code §§ 17-110.1(A) and -110.1(F), and have given them priority on the docket, Code § 17-110.2. We have also certified from the Court of Appeals of Virginia Eaton's appeal of his firearm conviction, Record No. 900239, and have consolidated the two records for our consideration.

## II. THE EVIDENCE

Pursuant to established principles of appellate review, we will view the evidence in the light most favorable to the Commonwealth. On February 20, 1989, while under the influence of drugs and alcohol, Eaton shot and killed Walter Custer, Jr., in an orchard near the mobile home they shared in Shenandoah County. Later that day, Eaton went to the Shenandoah County home of Ripley Marston, a friend and neighbor. Eaton shot, killed, and robbed his friend, taking Marston's wallet, containing $15, and

---

[1] Code § 18.2-31(6) defines as capital murder: "The willful, deliberate, and premeditated killing of a law-enforcement officer as defined in § 9-169(9) when such killing is for the purpose of interfering with the performance of his official duties."

Marston's 1981 Ford Fairmont automobile. Eaton then returned to his mobile home where he joined his girlfriend, Judy Ann McDonald, who also resided there. The pair decided to flee Shenandoah County in order to avoid Eaton's scheduled court appearance the following week on unrelated burglary and larceny charges; Eaton "didn't want to go to jail." They drove south on Interstate Highway 81.

Approximately 11:30 p.m. that evening, Virginia State Master Trooper Jerry L. Hines, who was patrolling Interstate 81 in Rockbridge County, caused the Ford to stop. Judy was operating the vehicle, and Hines, who suspected her of driving while intoxicated, called his dispatcher for a radio check on her operator's license. Soon thereafter, Hines asked for a "signal 25," which enabled all state troopers in his vicinity to receive his radio transmissions. In this transmission, Hines was heard saying, "hold still there, hold still there just a minute." In the background, a woman's voice could be heard. Virginia State Trooper Allen K. Golleher, Jr., was just minutes away when he heard Hines request assistance because "he was having a problem with a drunken driver."

Charles W. Dees, an interstate truck driver, was driving south on Interstate 81 while Hines was in the process of arresting Judy. He "observed a man and a woman and the Trooper all standing between the two vehicles, in the headlights of the Trooper's car." Dees saw the trooper "really chewing . . . out" the man who was standing a few feet in front of him while the woman was standing next to the right rear fender of the Ford. Soon thereafter, Dees again saw the Ford approximately eight miles down the road as it sped past him southbound toward Salem.

Trooper Golleher arrived at the scene at 11:55 p.m. He found Hines' police cruiser with its motor running, the doors closed, and the flashing lights on. As Golleher approached the front of the car, he saw Hines lying dead, face-down, just beyond the bumper, in a pool of blood. Golleher rolled the trooper's body over and saw two bullet holes; one in Hines' neck and another in his chest. Hines' service revolver was still holstered, with the strap secured. Golleher found the registration to Marston's 1981 Ford on the seat of Hines' cruiser and "advised State Police Salem" that Trooper Hines had been killed and that the suspected perpetrator was headed toward Salem in a 1981 Ford. Golleher found a summons in Hines' cruiser citing Judy McDonald for a traffic offense, along with the Ford's registration card, enabling Golleher to

transmit the license number and description of the car. The dispatcher broadcast a lookout for the Ford and its occupants.

Approximately 1:30 a.m., Salem Police Officer Michael E. Green found the Ford in the parking lot of a fast food restaurant in Salem. When Green pulled in behind the Ford, he shone a spotlight into its rear window. Green then got out of his vehicle, drew his revolver, shouted "police," and instructed the two occupants, Eaton and Judy McDonald, to put their hands on their heads. Judy reached for the floor and thereafter Green saw a pistol in Eaton's right hand. Green fired a shot at the car and Eaton put it in gear and drove out of the parking lot. A high-speed chase ensued, in which the cars attained speeds of 100 miles per hour through city streets. Several other officers in their police cruisers joined the pursuit.

The chase ended when Eaton crashed into a street lamp post. As fire and smoke emanated from the Ford, the police officers took up positions surrounding the vehicle. Before the police could take the pair into custody, Eaton shot Judy in the left temple and then fired a shot into his own head. When they were pulled from the wreckage, Judy was dead, and Eaton was alive but unconscious. His hands were wet and bloody. Subsequently, Eaton was transported to Roanoke Memorial Hospital where he was treated for a gunshot wound to the head.

The police recovered a .38 caliber handgun from the Ford. According to forensic tests, the handgun was the weapon used to kill Custer, Marston, Hines, and Judy McDonald. Although Eaton had used the gun to shoot Custer, Marston, Judy, and himself, forensic tests for powder residue on his hands were negative. According to a forensic expert, however, prior to testing the residue could have been washed off Eaton's hands by water or blood, both of which were in abundant supply at the scene due to Eaton's injury and the fire department's efforts to douse the burning automobile. Forensic tests performed on Judy's hands demonstrated that she had also handled the weapon. Eight empty shell casings were found in Eaton's pockets. The pistol had been fired at least seven times that day, before the crash. Custer had received three shots, Marston two, and Hines two.

Approximately 7 a.m. on February 21, 1989, shortly after Eaton received treatment for his wounds, Virginia State Police Special Agent George D. Watts approached him in his hospital room. Watts informed Eaton of his constitutional rights. Eaton indicated

that he understood by nodding his head up and down. Watts then asked Eaton if he was "willing to continue to answer questions," to which Eaton indicated "no" by shaking his head. Watts immediately ceased the questioning and left the room.

Three days later, on February 24, 1989, Eaton was released from the hospital and transferred to the Roanoke County jail, where he was incarcerated for the alleged murder of Judy McDonald. Sergeant Jeffrey Dudley of the Salem Police Department and Detective C.R. Hottinger of the Rockingham County Sheriff's Department arrived at the jail that afternoon to meet with other officers and a Rockingham County prosecutor. Their discussion centered on unrelated burglary and larceny charges pending against Eaton in Rockingham County, for which counsel had been appointed. The prosecutor informed the officers that those charges had been "*nolle prossed*" earlier that day. Dudley and Hottinger then entered an interrogation room where Eaton was seated.

The officers advised Eaton of his constitutional rights and he indicated that he understood them. The officers then proceeded to interrogate Eaton and to discuss Judy's burial. Eaton neither admitted nor denied shooting Trooper Hines. When asked whether Judy shot Hines, Eaton stated: "Judy was a good girl. Judy wouldn't hurt anybody." The interrogation eventually ceased when Eaton became confused and asked for "some time to think."

Two days later, on February 26, Eaton sent a message to Dudley requesting that he deliver a photograph of Judy to the jail. After Dudley delivered the photograph and again advised Eaton of his constitutional rights, Eaton began asking about Judy's wounds, indicating that he thought that she was already dead when he shot her. Eaton also said that "Judy was upset . . . that the trooper was going to arrest her." Additionally, Eaton related details of the murders of Custer and Marston.

Pursuant to a plea agreement dated November 21, 1989, Eaton pleaded guilty in Shenandoah County to the first degree murder of Custer, the capital murder and robbery of Marston, and other related offenses. He was sentenced to three consecutive life terms plus 44 years. Eaton also accepted the provisions of Code § 53.1-151(B1), under which he would be ineligible for parole. He subsequently entered a guilty plea in Rockbridge County to the murder of Judy McDonald.

In the guilt phase of Eaton's trial for the murder of Trooper Hines, Chadwick J. Holley, another inmate of the Roanoke

County jail, testified that Eaton had admitted being the trigger-man. Holley, who was in jail on drug charges, testified that Eaton discussed each killing at length. With regard to Trooper Hines, Eaton told Holley that, as the Trooper and Judy were returning to the Ford from the police cruiser, Eaton "shot the cop." Holley then gave a detailed description of Eaton's getaway and the subsequent high-speed chase which resulted in Eaton's capture.

An autopsy performed on the Trooper's body indicated that he was shot twice. One bullet, fired from 9 to 18 inches away, pierced his chest at the right armpit and traveled downward through his heart and lung. The second bullet, fired from 12 to 24 inches away, pierced his neck and traveled through his windpipe. Each wound would have been fatal.

In his defense, Eaton testified that he had told Holley that it was Judy, not he, who shot Trooper Hines. He testified that Judy shot the trooper because she did not want to go to jail. The jury, however, rejected Eaton's version and found him guilty of capital murder.

At the penalty phase of the trial, the Commonwealth argued for the death penalty based solely upon the aggravating factor of Eaton's "future dangerousness." It introduced evidence of the Custer, Marston, and McDonald murders, and entered a part of Eaton's Shenandoah County plea agreement into evidence. The jury was not informed that Eaton was ineligible for parole as a result of the agreement, and the defense objected to the deletion of that part of the plea bargain. Holley testified at the penalty phase that as Eaton described the murders, he joked that he was free to blame the trooper's death on Judy because she was dead. Additionally, the Commonwealth introduced evidence from two other inmates at the Roanoke County Jail who testified that Eaton had fashioned a "shank," a weapon made out of wire and a spring from a shower curtain rod, with which he planned to escape by overpowering a guard and taking his weapon.

Eaton's evidence in mitigation consisted of a psychologist's testimony describing Eaton's intelligence as "low-average," and the testimony of certain jail employees that Eaton was not a problem prisoner.

After receiving instructions from the trial court, the jury retired to determine the sentence. Following over two hours of deliberations, the jury notified the trial court that it was deadlocked and inquired whether a unanimous vote, such as is required for the

death sentence, was required to impose a life sentence. The trial court responded: "I cannot instruct you beyond the instruction which you have received; if you are unable to agree upon the penalty, please advise the court."

No further communication was received from the jury. Three and one-half hours later, the jury returned with a unanimous verdict fixing Eaton's punishment at death.

## III. ASSIGNMENTS OF ERROR WAIVED

■ Eaton is deemed to have waived Assignments of Error 2, 5, 7, 11, 12, and 30.[2] Despite assigning error to these issues, Eaton failed to argue them on brief. Therefore, pursuant to Rule 5:27(e), we will not consider them on appeal. *Cheng* v. *Commonwealth*, 240 Va. 26, 41, 393 S.E.2d 599, 607 (1990).

## IV. ISSUES PREVIOUSLY DECIDED

■ Eaton's appeal raises certain issues which have been decided adversely to his claims by our previous decisions. We adhere to those rulings and, accordingly, will not discuss them further here. The issues thus previously resolved are whether:

A. The death penalty is unconstitutional. See *Spencer* v. *Commonwealth*, 240 Va. 78, 84, 393 S.E.2d 609, 613 (1990) (Spencer IV).

B. The defendant should have been granted additional peremptory challenges. See *id.*

---

[2] These assignments of error complained:

(2) That the trial court erred by denying the Defendant's Motion in Limine to prohibit the introduction of evidence at trial concerning the commission of other adjudicated and unadjudicated acts committed in Shenandoah County and the City of Salem;

(5) That the trial court erred by refusing to give the Defendant's proposed statement explaining the process of Voir Dire to prospective jurors;

(7) That the trial court erred by refusing to allow the Defendant to question prospective jurors about the credibility of "jailhouse snitches" as set out in proffered Voir Dire question number 9;

(11) That the trial court erred by admitting the testimony of M. Frederick King in the Commonwealth's case in chief as such testimony was offered for the purpose of buttressing the testimony of Commonwealth's witness, Chadwick Holley;

(12) That the trial court erred by admitting the testimony of Jeff Dudley in the Commonwealth's case in chief as such testimony was offered for the purpose of buttressing the testimony of Commonwealth's witness, Chadwick Holley; and

(30) That the trial court erred by refusing to set aside the sentence of death after review of the post-sentence report pursuant to Virginia Code Section 19.2-264.5.

C. By permitting *voir dire* questions concerning the death penalty, the court impanelled a "death-prone" jury. See *Pruett* v. *Commonwealth*, 232 Va. 266, 277-78, 351 S.E.2d 1, 7-8 (1986), *cert. denied*, 482 U.S. 931 (1987).

## V. *VOIR DIRE*

### A. Refusal to Strike Veniremen for Cause.

■ Eaton contends that the trial court erred in retaining four veniremen over his objections. As an appellate court, we must give deference to the trial court's decision whether to retain or exclude individual veniremen because the trial court "sees and hears the juror." *Wainwright* v. *Witt*, 469 U.S. 412, 426 (1985); *accord Spencer* v. *Commonwealth*, 238 Va. 563, 572, 385 S.E.2d 850, 855 (1989), *cert. denied*, 493 U.S. _____, 110 S.Ct. 1171 (1990) (*Spencer III*); *O'Dell* v. *Commonwealth*, 234 Va. 672, 693, 364 S.E.2d 491, 503, *cert. denied*, 488 U.S. 871 (1988). For that reason, the trial court's decision in that regard will not be disturbed on appeal absent a showing of "manifest error." *Spencer IV*, 240 Va. at 94, 393 S.E.2d at 619.

■ The standard to be applied by the trial court in determining whether to retain a venireman on the jury panel is whether his answers during *voir dire* examination indicate to the court something that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980); *accord Turner* v. *Commonwealth*, 234 Va. 543, 549, 364 S.E.2d 483, 486, *cert. denied*, 486 U.S. 1017 (1988); *O'Dell*, 234 Va. at 695, 364 S.E.2d at 504.

### 1. Frances B. Gouldthorpe

During the *voir dire* examination of Frances B. Gouldthorpe, Eaton's counsel inquired about involvement with other criminal prosecutions. The juror said that she could not sit on a drunk driving case because she had had a previous "tragic experience" with respect to such an offense. After informing the juror that evidence of alcohol consumption was forthcoming, the trial court asked her if that evidence would affect her impartiality; she indicated that it would not.

■ Eaton contends that he "was prevented from engaging in meaningful inquiry regarding [Juror Gouldthorpe's] pre-formed

opinions about cases involving alcohol consumption." Those opinions, he continues, might have affected the juror's impartiality.[3] We do not agree. The record clearly demonstrates that the trial court, by inquiring about the juror's ability to remain impartial, was satisfied that her prior experience with drunk driving cases would not "prevent or substantially impair the performance of [her] duties as a juror." We find nothing in the record to indicate otherwise.

### 2. John Lutley

Eaton's counsel asked venireman John Lutley numerous, lengthy questions regarding a defendant's presumption of innocence and a defendant's option not to take the stand in his own defense. Initially, Lutley voiced concern about Eaton's not taking the stand. However, when asked: "You will listen to the evidence and fairly consider that along with the instructions?" Lutley responded: "Yes, and I understand that the case has to be made by the prosecution, not by the defense, I understand that." Over Eaton's objection, Lutley was seated on the jury.

■ Eaton contends that Lutley was "confused about the presumption of innocence" and, therefore, unqualified to sit on the jury.[4] We disagree. Taking Lutley's *voir dire* as a whole, *see Pruett*, 232 Va. at 281, 351 S.E.2d at 10, the record indicates that Lutley understood the presumption of innocence. With regard to Lutley's potential desire that the defendant take the stand, the trial court found that he could "disabuse [his] mind of [his] natural curiosity and decide the case on the evidence submitted and the law as propounded in the court's instructions." *See Townes* v. *Commonwealth*, 234 Va. 307, 329, 362 S.E.2d 650, 662 (1987), *cert. denied*, 485 U.S. 971 (1988). We find no "manifest error" in the trial court's retention of juror Lutley.

### 3. Phyllis J. Daines

During the *voir dire* of Phyllis J. Daines, Eaton's counsel posed several lengthy questions, essentially asking whether she would

---

[3] On brief, Eaton also argues that the juror should have been excused because she stated that she might "automatically" impose the death penalty. We will not consider this contention because Eaton did not raise it in the trial court. Rule 5:25.

[4] Eaton also argues, on brief, that Lutley was "death prone." Again, because Eaton did not raise this objection in the trial court, we will not consider it on appeal. Rule 5:25.

"automatically" impose the death penalty if Eaton were proved guilty. Initially, Daines answered, "Yes." When the trial court asked her if she meant to say "automatically," Daines emphatically stated: "I would not automatically" impose the death penalty.

■ Eaton contends that Juror Daines was clearly "death prone." On the contrary, the record indicates that she would not "automatically" impose the death sentence. Her only error was in responding "yes" to a lengthy and confusing question posed by Eaton's counsel which contained the word "automatically." When the question was posed in clear and unambiguous terms by the trial court, the juror responded that she would abide by the trial court's instructions. There was no error in seating juror Daines.

### 4. Donald S. Cherry

■ Eaton contends that venireman Donald S. Cherry should have been excused for cause because Cherry stated that he "would lean towards" the death penalty if Eaton were convicted of capital murder.[5] However, taking Cherry's *voir dire* as a whole, the record clearly shows that he would give evidence in mitigation the same weight as evidence in aggravation. Based on the record, we agree with the trial court that Cherry was not "death prone."

### B. Questions Concerning Parole Eligibility

The defense proposed a *voir dire* question which informed the jury that Eaton would be ineligible for parole by reason of sentences previously imposed upon him for his other murders. The question also asked the jurors whether they could consider a sentence "less than death" if they were instructed not to concern themselves with the possibility of parole or of Eaton's ultimate return to society. The court sustained the Commonwealth's objection to the question and Eaton assigns error to that ruling.

■ Information regarding parole eligibility is not relevant evidence to be considered by the jury. *Spencer IV*, 240 Va. at 85, 393 S.E.2d at 613; *Watkins* v. *Commonwealth*, 238 Va. 341, 351, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. ____, 110 S.Ct.

---

[5] Eaton also argues, on brief, that Cherry "was confused about the presumption of innocence requirement and he doubted his ability to apply the law and facts effectively." Because Eaton did not raise this objection in the trial court, we will not consider it on appeal. Rule 5:25.

1797 (1990); *Williams* v. *Commonwealth*, 234 Va. 168, 178-80, 360 S.E.2d 361, 367-68 (1987), *cert. denied*, 484 U.S. 1020 (1988); *Poyner* v. *Commonwealth*, 229 Va. 401, 418-19, 329 S.E.2d 815, 828, *cert. denied*, 474 U.S. 865, 888 (1985). Indeed, "the jury has no right to be advised of post-sentencing events." *Id.* at 432, 329 S.E.2d at 836. The Supreme Court has expressly left this question to be determined by the States, as a matter of state law. *California* v. *Ramos*, 463 U.S. 992, 1013-14 (1983). Therefore, the trial court did not err in refusing Eaton's proposed *voir dire* question.[6]

## VI. SUPPRESSION OF STATEMENTS TO POLICE

Contending that they were obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments, Eaton assigns error to the court's refusal to suppress the statements he made to the police on February 24 and February 26. Eaton did not testify at the October 30 hearing on his motion to suppress. The only witnesses to his statements were the two police officers, Dudley and Hottinger, who interviewed him on February 24 and February 26.

Although the testimony of the two officers differed in some respects, they both testified that Eaton received full *Miranda* warnings before, and several times during, his interrogation; that he gave every indication that he fully understood them; that he made inquiries about his entitlement to the assistance of counsel; that he was repeatedly told that he was not required to talk to the officers in the absence of counsel; and that counsel would be obtained for him if he so desired. Both officers testified that Eaton never requested counsel and that he continued, quite voluntarily, to discuss the case with them. At the conclusion of the hearing, the court found that Eaton had never invoked his right to counsel and that his statements were freely and voluntarily made. Our examination of the record satisfies us that the court's findings were supported by the evidence.

 Sgt. Dudley's testimony, more favorable to the defense, was offered by the defense. Detective Hottinger, whose version

---

[6] For this reason, we also reject Eaton's assignments of error to the court's rulings which deleted that part of his Shenandoah County plea agreement relating to parole eligibility and refused his proffered Instructions B and C at the penalty phase of trial, which would have told the jury that he was ineligible for parole.

was more favorable to the Commonwealth, was called as a Commonwealth witness. In accordance with familiar principles of appellate review, we will review the evidence concerning the interviews in the light most favorable to the prevailing party.[7]

As stated earlier, when Special Agent Watts attempted to interview Eaton on February 21, Eaton indicated by a shake of his head that he did not wish to answer any questions and Watts left immediately. No further efforts were made to interview him until Dudley and Hottinger met him in an interview room on February 24. Dudley gave Eaton *Miranda* warnings, and Eaton said that he understood them. After discussing the high-speed chase, the crash, the shooting of Judy, and Eaton's attempted suicide, Dudley turned to the shooting of Trooper Hines. Dudley said: "The reason you shot the trooper was because he had stopped you?" Eaton replied, "He was going to arrest Judy." At that point, Eaton asked Dudley: "You did say I could have an attorney if I wanted one?" Hottinger then told Eaton "that he didn't have to tell [the officers] anything; that he did have the right to have an attorney if he wanted one."[8]

A short period of silence followed. Dudley left the room for a few minutes. Hottinger then told Eaton about the funeral of Judy McDonald and where she was to be buried. They discussed that subject until Dudley returned.

After Dudley's return, the officers asked some questions about the gun. Eaton described the traffic stop by Trooper Hines and Judy's arrest. He said that Judy wasn't drunk. Hottinger then asked Eaton "if Judy had shot the trooper." Eaton replied: "Judy was a good girl and she wouldn't hurt anyone." He neither directly admitted nor denied shooting Trooper Hines and, in contrast to his later testimony at trial, gave no hint that Judy was the perpetrator of the crime. Eaton made no other statement concerning the Hines killing.

██ A waiver of an accused's right of counsel must not only be voluntary; it must also constitute a knowing and intelligent relinquishment and abandonment of a known right or privilege. In each case, this depends "upon the particular facts and circumstances surrounding that case, including the background, experi-

---

[7] The dissenting opinion is entirely based upon the version most favorable to the defendant. It assumes that the facts were as related by Sgt. Dudley.

[8] Hottinger testified that Eaton made similar inquiries, and received similar responses, on "two or three" occasions during the February 24 interview.

ence, and conduct of the accused." *Edwards* v. *Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938)); *North Carolina* v. *Butler*, 441 U.S. 369, 374-75 (1979).

A waiver of the right to counsel, however, need not be explicit; it can be shown by the circumstances. *Cheng*, 240 Va. at 35, 393 S.E.2d at 604. In the present case, the court inferred such a waiver from Eaton's willingness to engage in a discussion of the case with the officers after receiving *Miranda* warnings and indicating that he understood them. *See North Carolina* v. *Butler*, 441 U.S. at 373. The court also noted that Eaton was no stranger to the criminal justice system. He had been arrested on prior occasions, had received numerous *Miranda* warnings in the past, and until the morning of February 24, when his Rockingham County charges were "*nolle prossed*," had the benefit of court-appointed counsel in those cases. He had conferred with, and had been advised by, that attorney. Eaton's intelligence was in the "low average" range, and there is no evidence that he was mentally impaired by his self-inflicted gunshot wound or by any other cause. We conclude that the record supports the trial court's finding that Eaton voluntarily and intelligently waived his right to counsel in the first instance, when he entered into discussions with officers Hottinger and Dudley on February 24.

Eaton contends that this might be true had he not refused an interview with Special Agent Watts on February 21, but that his refusal on that occasion had the effect of prohibiting *any* subsequent interviews unless he initiated them. We do not agree. It is true that if Eaton had requested counsel on February 21, no subsequent police-initiated questioning would have been permitted in counsel's absence. *Edwards*, 451 U.S. at 484-85. A mere refusal to speak, however, is not the same as a request for counsel. The police "scrupulously honored" Eaton's right to remain silent, and they did not violate that right when they re-initiated questioning three days later, following renewed *Miranda* warnings. *Michigan* v. *Mosley*, 423 U.S. 96, 106-07 (1975) (police did not violate defendant's right of silence by re-initiating questioning, after renewed *Miranda* warnings, three hours after defendant had invoked right to remain silent).

Eaton also contends that his Sixth Amendment rights were infringed because he had appointed counsel in his unrelated property-crime cases in Rockingham County (terminated by *nolle prosequi* just before the interview on February 24) who was not

present at the interview. That contention is also untenable. Eaton's Sixth Amendment right to counsel had not yet attached with respect to the murder of Trooper Hines because "adversary judicial proceedings" had not yet been initiated on that charge. *See Michigan* v. *Jackson*, 475 U.S. 625, 629 (1986). The Sixth Amendment rights attached to Eaton's charges in Rockingham County were specific to those charges. Such rights do not travel with a defendant and attach themselves to any other crimes he might commit. *Maine* v. *Moulton*, 474 U.S. 159, 180 n.16 (1985). Therefore, Eaton's Rockingham County counsel had no involvement with the present case, and the Rockingham cases, even if they had remained pending, would have conferred no rights upon Eaton with respect to the Hines murder.

Eaton next argues that even if his right to counsel was validly waived at the inception of the February 24 interview, he invoked it during the course of the conversation. Citing *Edwards*, he contends that when he mentioned his right to counsel the interview should have ended immediately, to be resumed only in the presence of counsel or upon Eaton's own initiative.

The holding of *Edwards* is succinct:

> [W]e now hold that when an accused *has invoked his right to have counsel present during custodial interrogation*, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, *having expressed his desire to deal with the police only through counsel*, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85 (footnote omitted) (emphasis added). Our inquiry, therefore, must focus upon the question whether Eaton "invoked his right to have counsel present" or "expressed his desire to deal with the police only through counsel."

 We agree with the trial court that Eaton's utterances concerning his right to counsel were equivocal. Authorities in other jurisdictions have adopted differing standards with respect to the specificity with which a request for counsel must be expressed.

Some courts require a clear and unambiguous request, some prohibit all further questioning when the subject of counsel is mentioned in any way, while others permit further questioning only for the purpose of resolving the ambiguity. The United States Supreme Court has not expressly decided the question, *Smith* v. *Illinois*, 469 U.S. 91, 95-96 (1984), but has expressed a preference for "bright-line rules" for the guidance of the police who must conduct custodial interrogatories. *Fare* v. *Michael C.*, 442 U.S. 707, 718 (1979).

▇▇▇ The trial court, relying on *Poyner* v. *Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 888 (1985) and *Bunch* v. *Commonwealth*, 225 Va. 423, 304 S.E.2d 271, *cert. denied*, 464 U.S. 977 (1983), concluded that the standard prevailing in Virginia is that a request for counsel must be "unambiguous and unequivocal" in order to trigger the *Edwards* rule. We distinguished the facts in *Bunch* from those in *Edwards* by pointing out that "where *Edwards* involved an unequivocal statement by the accused that he wanted counsel, Bunch's statement . . . was couched in ambiguous terms to the effect that he *might* want to talk to a lawyer." *Bunch*, 225 Va. at 433, 304 S.E.2d at 276 (emphasis in original). We noted a further distinction: in *Edwards*, the defendant was told that he had to talk to the police. Bunch, like Eaton, was told that he need not do so. *Id.*

The circumstances in *Poyner* were remarkably close to those of the present case. After police officers had given Poyner *Miranda* warnings, they summarized the information in their possession linking Poyner with one of the murders charged against him. At that point, Poyner asked, "Didn't you say I have the right to an attorney?" The officers said, "Yes." Citing *Bunch*, we held that the defendant's statement was not a request for counsel. "At most, it sought to clarify one of the rights of which he had already been advised." *Poyner*, 229 Va. at 410, 329 S.E.2d at 823. The trial court's view that we have required a clear request for counsel was, therefore, well-founded.

▇▇▇ We share the U.S. Supreme Court's preference for "bright-line" rules for the guidance of those who must conduct and evaluate custodial interrogations. In further explication of the views expressed in *Bunch* and *Poyner*, we hold that the *Edwards* rule is invoked, and that custodial interrogation must cease, when the accused, having received *Miranda* warnings and having begun to respond to the questions of the authorities, "has *clearly* as-

serted his right to counsel," *Edwards*, 451 U.S. at 485 (emphasis added). Because Eaton's words and conduct fell short of that standard, we hold that he failed to invoke his right to counsel and that the *Edwards* rule did not come into play on February 24.

Eaton's constitutional rights were not infringed in any respect by the interview of February 26. It was initiated at Eaton's request, thus complying with the *Edwards* criterion. Eaton asked Sgt. Dudley to return to the jail in order to deliver a picture of Judy McDonald. When Dudley arrived, he delivered the photograph to Eaton, gave him renewed *Miranda* warnings, and responded to Eaton's questions about Judy. Eaton then responded to a number of questions about the Custer, Marston, and McDonald crimes. The only statements made concerning the present case were to the effect that Judy was upset because the trooper was going to arrest her. Eaton described the positions in which the three were standing between the cars, but said nothing about the shooting of Trooper Hines. He made no reference to counsel during the interview. We conclude that the trial court did not err in denying Eaton's motion to suppress his statements.

## VII. SUFFICIENCY OF THE EVIDENCE - TRIGGERMAN

Eaton assigns error to the court's denial of his motion to strike the evidence at the guilt phase. He contends that the evidence was insufficient to establish that he, rather than Judy McDonald, fired the shots that killed Trooper Hines. The short answer to that contention is that the jury was entitled to, and obviously did, accept the testimony of Holley. Despite Eaton's attack on the credibility of Holley as a "jailhouse snitch," Holley's testimony was corroborated in several respects: first, the circumstantial evidence of the relative locations of assailant and victim when the shots were fired; second, Eaton's murderous career on February 20 which cost three other lives; and third, Eaton's statements to the police in which he made no contention that Judy McDonald had been Hines' killer. Eaton's effort to blame the killing on Judy did not emerge until the trial, by which time Eaton's regard for her had evidently worn thin.

## VIII. JURY INSTRUCTIONS - GUILT PHASE

The trial court granted the Commonwealth's proposed Instruction No. 6 which stated:

You may consider evidence that the defendant committed other offenses other than the offense for which he is on trial only as evidence of the defendant's motive; as evidence of the defendant's intent; as evidence of the defendant's knowledge; as evidence of the defendant's conduct and feelings toward the victim and relations between them; evidence of the defendant's malice; as evidence of the defendant's premeditation; as evidence of the defendant's opportunity in connection with the offense for which he is on trial and for no other purpose.

Eaton's proposed Instruction A, which was refused by the trial court, stated:

The court instruct[s] the jury that you are not to consider evidence of the fact that defendant has plead guilty to homicide in Shenandoah County and the City of Salem, Virginia as evidence of his guilt of the capital murder of Trooper Jerry Hines.

In refusing Instruction A, the trial court ruled that it was duplicative of Instruction No. 6. We agree. The granted instruction, while not felicitously phrased, fairly covered the principle of law at issue. The trial court did not abuse its discretion in refusing to grant another, duplicative instruction. *Stockton* v. *Commonwealth*, 227 Va. 124, 145, 314 S.E.2d 371, 384, *cert. denied*, 469 U.S. 873 (1984).

Eaton's proposed Instructions B and C would have instructed the jury on the definition of a principal in the second degree and on the jury's duty to convict the defendant of the lesser offense if it had a reasonable doubt as to his guilt on the capital murder charge. The trial court refused both instructions, ruling that there was no foundation for either in the evidence.

"A defendant is entitled to have the jury instructed only on those theories of the case that are supported by evidence." *Frye* v. *Commonwealth*, 231 Va. 370, 388, 345 S.E.2d 267, 280 (1986). More than a scintilla of evidence must be present to support an instruction. *Id.*

Eaton contends, based upon his own testimony, that there was sufficient evidence in the record to support his theory that he was a principal in the second degree. He points, specifically, to his testimony in which he stated that Trooper Hines instructed him to

return to the Ford and wait for another trooper to arrive. On brief, Eaton argues that by following the trooper's instructions, he purposefully distracted Hines, giving McDonald the opportunity to shoot the trooper.

There is no evidence in the record to support this theory. Eaton never testified that he was attempting to distract Trooper Hines, nor was any other evidence introduced to indicate such an attempt. Because the evidence fails to support defendant's proposed Instructions B and C, the trial court correctly denied them.

Eaton also proffered Instruction D, which would have instructed the jury to find Eaton guilty of second degree felony murder if it believed Trooper Hines was killed during the continuing larceny of Marston's car. The trial court, however, denied the instruction because it was "an incorrect statement of the law," and there was insufficient evidence to support it.

Eaton contends that Instruction D was proper "because of the continuing larceny of the Marston vehicle in which a murder occurred without Eaton being the triggerman." We disagree.

The felony murder statute, Code § 18.2-33, defines the crime as "[t]he killing of one *accidentally*, contrary to the intention of the parties, while in the prosecution of some felonious act . . . ." (Emphasis added.) Clearly, no evidence was introduced to indicate that Trooper Hines was killed "accidentally." Therefore, Instruction D was unsupported by any evidence, and the trial court properly refused the instruction.

## IX. JURY INSTRUCTIONS - PENALTY PHASE

Eaton proffered six jury instructions, A through F, at the penalty phase of the trial. The trial court refused all six. Eaton assigns error to each refusal.

Instructions A, D, E, and F were all variations on Instruction 1, proffered by the Commonwealth, and approved by the trial court. That instruction, tailored to the aggravating factor of "future dangerousness," stated:

> You have convicted Dennis Wayne Eaton of an offense which may be punished by death. You must decide whether Dennis Wayne Eaton shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt that, after consideration of his history and background, there is a

probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society.

If you find from all the evidence, unanimously, that the Commonwealth has proven beyond a reasonable doubt that, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, then you may fix the punishment of Dennis Wayne Eaton at death or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of Dennis Wayne Eaton at life imprisonment.

If the Commonwealth has failed to prove beyond a reasonable doubt that, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, then you shall fix the punishment of Dennis Wayne Eaton at life imprisonment.

Instruction A would have added: "If, after conscientious discussion and deliberation, you cannot reach a unanimous decision whether to impose the death sentence or life imprisonment, you may so advise the Court." Eaton argued that this was a better statement of the law. The trial court, however, refused Instruction A because it would have allowed the jury to avoid its duty. We agree.

Besides being duplicative of an instruction previously granted, *Stockton*, 227 Va. at 145, 314 S.E.2d at 384, Instruction A would have given the jury an easy way to avoid determining a sentence. While Code § 19.2-264.4(E) provides for the imposition of a life sentence by the trial court when the jury cannot agree upon a penalty, the jury, nevertheless, has a duty conscientiously to attempt to arrive at a sentence. Thus, the trial court correctly refused Instruction A.

Similarly, Instructions D, E, and F were duplicative of Instruction 1. Instruction D informed the jury that it could not base the death sentence solely upon the fact that Eaton killed a police officer. Instruction E listed a number of mitigating factors to be considered by the jury, and Instruction F stated that the jury could impose a life sentence despite finding beyond a reasonable doubt the existence of aggravating circumstances. Because Instruction 1 fully and fairly instructed the jury on the applicable

law, we cannot say that the trial court abused its discretion by ruling that Eaton's proffered Instructions A, D, E, and F, were duplicative. *Stockton*, 227 Va. at 145, 314 S.E.2d at 384. We have previously considered and rejected Eaton's assignments of error to the refusal of his penalty-phase Instructions B and C, *supra* n.6.

## X. SUFFICIENCY OF EVIDENCE REGARDING "FUTURE DANGEROUSNESS"

During the penalty phase, Eaton moved to strike at the conclusion of the Commonwealth's evidence and again at the close of all the evidence. The court denied both motions. The jury returned a sentence of death, "having unanimously found after consideration of [Eaton's] history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society."

In contending that the Commonwealth failed to produce sufficient evidence to indicate that he would pose a future threat to society, Eaton ignores the evidence which reveals that he committed four unprovoked and seemingly irrational murders, and related crimes, within a 24-hour period. Additionally, Eaton joked about his crime spree to Holley and, while incarcerated, fashioned a deadly weapon with which he planned to assault a guard in an escape attempt. After considering this, and the evidence introduced in mitigation, we conclude that there was ample evidence presented by the Commonwealth to support the jury's finding that Eaton posed a continuing, serious threat to society.

## XI. JURY DEADLOCK

Upon being instructed by the court at the penalty phase of trial, the jury retired to consider its verdict. As noted above, after approximately two and one-half hours, the foreman sent a note to the trial court requesting further instruction: "We continue to be deadlocked with the same vote after two and a half hours. The Death Verdict indicates we must be unanimous. The Life imprisonment does not indicate a unanimous vote is necessary. Please clarify." The trial court responded: "I cannot instruct you beyond the instruction which you have received; if you are unable to agree upon the penalty, please advise the court." No other response

came from the jury until three and one-half hours later when it returned a unanimous verdict fixing punishment at death.

Eaton contends that, upon receiving the note, the trial court was required to discharge the jury and impose a life sentence pursuant to Code § 19.2-264.4(E). That provision states: "In the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life." Further, Eaton maintains that if the trial court did not dismiss the jury, it should have given a supplemental charge informing it that if it could not reach a unanimous decision, the trial court would impose a life sentence.

Neither option proposed by Eaton was warranted. Obviously, the jury was not finally deadlocked. When a jury is deciding a matter of the gravity of a capital murder sentence, two and one-half hours is not an excessive time for deliberation. The jury had been instructed fully regarding the law applicable to sentencing, and the trial court did not abuse its discretion in its response to the jury's inquiry.

The state has a strong interest, in a capital sentencing proceeding, in having the conscience of the community expressed by a jury on the ultimate question of life or death. *Lowenfield* v. *Phelps*, 484 U.S. 231, 238 (1988). The court is entitled to encourage the jury to continue its deliberations for a reasonable time even after the jury has indicated that it is deadlocked. *Id.*; *U.S.* v. *Gordon*, 817 F.2d 1538, 1543 (11th Cir. 1987), *cert. dismissed*, 487 U.S. 1265 (1988); *accord United States* v. *Thibodeaux*, 758 F.2d 199, 203 (7th Cir. 1985). In our view, Code § 19.2-264.4(E) becomes applicable only after it has become apparent to the trial judge, following a reasonable period of deliberation, that further deliberations would be fruitless and that the jury's deadlock is final.

## XII. PASSION, PREJUDICE, AND PROPORTIONALITY

Code § 17-110.1(C) requires us to review the death sentence on the record to consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have accumulated the records of all capital murder cases reviewed by this Court, pursuant to Code § 17-110.1(E), giving particular attention to those cases in which the death penalty was based solely upon the "future dangerousness" predicate, *e.g., Savino v. Commonwealth*, 239 Va. 534, 391 S.E.2d 276 (1990); *Fisher v. Commonwealth*, 236 Va. 403, 374 S.E.2d 46 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Pope v. Commonwealth*, 234 Va. 114, 360 S.E.2d 352 (1987), *cert. denied*, 485 U.S. 1015 (1988); *Peterson v. Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *Bassett v. Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982); *Evans v. Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985); *Giarratano v. Commonwealth*, 220 Va. 1064, 266 S.E.2d 94 (1980); and *Stamper v. Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980). After considering those records, as well as cases in which life imprisonment was imposed, we conclude that Eaton's sentence of death was neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for comparable or similar crimes. Additionally, nothing in the record suggests that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## XIII. CONCLUSION

We find no reversible error among the issues presented by Eaton's appeal. Having reviewed the sentence of death pursuant to Code § 17-110.1, we decline to set it aside. Accordingly, we will affirm the judgments in both cases.

Record No. 900238 - *Affirmed.*
Record No. 900239 - *Affirmed.*

JUSTICE LACY, with whom JUSTICE WHITING joins, concurring in part and dissenting in part.

I concur with the majority in all respects except the rule adopted by the majority to determine whether an individual invoked his Fifth Amendment right to counsel.

*Edwards* v. *Arizona*, 451 U.S. 477 (1981), requires the police to stop questioning a suspect when he invokes his Fifth Amendment right to counsel. Interrogation may not be resumed until a lawyer is present, or until the suspect himself reinitiates the dialogue. The question in this case is whether Dennis Wayne Eaton invoked his Fifth Amendment right to counsel during his interrogation by Officers Dudley and Hottinger on February 24 when he referred to counsel with statements such as "Maybe I ought to talk to a lawyer," "Didn't you say I had a right to a lawyer," and "I need to talk to someone, a lawyer, a psychiatrist, someone."[1]

In my opinion, when equivocal statements such as these are made, the most obvious and appropriate response is to ask the suspect, "Do you want a lawyer?". The suspect's response to this question should resolve the ambiguity and allow the interrogators to proceed accordingly. This test is easy to apply, consistent with *Miranda* v. *Arizona*, 384 U.S. 436 (1966) and its progeny, and efficient in terms of police and court time. It provides a true bright-line rule which is fair to defendants and police alike.[2]

---

[1] The majority's holding that, under *Poyner* v. *Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 888 (1985), Eaton's statement inquiring about his right to an attorney was only a clarifying question and not a request for counsel, does not address the consequences of Eaton's remaining references to counsel.

Detective Hottinger's initial handwritten notes only referred to Eaton's statement that he needed to talk to someone. Hottinger's second, typewritten set of notes and his testimony at the suppression hearing state that Eaton referred to an attorney on two or three other occasions, but Hottinger did not recite the precise wording of those statements. Dudley's notes state that Eaton said "he ought to talk to a lawyer," "maybe I better talk to a lawyer," and "maybe I ought to talk to a lawyer." Although the evidence must be considered in the light most favorable to the Commonwealth, the evidence upon which the trial court relied must also be considered. Without identifying either Hottinger or Dudley by name, the court held that statements testified to by each, "Did you say I had a right to an attorney?", and "I might ought to talk to an attorney," were ambiguous and equivocal and, therefore, did not constitute a request for counsel.

[2] This approach to determining whether the defendant intends to invoke his constitutional right has been adopted by a number of courts. *See, e.g., Norman* v. *Ducharme*, 871 F.2d 1483 (9th Cir. 1989); *Owen* v. *Alabama*, 849 F.2d 536, 539 (11th Cir. 1988); *U.S.* v. *Gotay*, 844 F.2d 971 (2d Cir. 1988); *U.S.* v. *Fouche*, 776 F.2d 1398 (9th Cir. 1985), *cert.*

Under the rule adopted today, however, the constitutional right to an attorney cannot be invoked unless the defendant utilizes language which is clear, unambiguous, and unequivocal. This is a very demanding standard to place on the exercise of one's constitutional rights, and I believe it has both practical and legal flaws.

The cornerstone of *Miranda* was to dispel the inherent coercion of custodial interrogations, and to allow a defendant to exercise his free will in asserting his constitutional privileges. A principal objective of this policy was to allow a defendant to request counsel "in any manner" and at any stage of the proceeding. *Miranda*, 384 U.S. at 444. The standard adopted by the majority today complies with neither the rationale, nor the language, of the Supreme Court.

In support of their standard, the majority cites one phrase from *Edwards* v. *Arizona*; a phrase in which the Supreme Court declared that *Miranda* does not allow the police to continue a custodial interrogation if the defendant "has *clearly asserted* his right to counsel." 451 U.S. at 485 (emphasis added). This phrase provides tenuous support at most for the majority's position.

*Edwards* involved the waiver of a constitutional right, not the invocation of that right. There was no question as to whether or not the defendant wished to have an attorney present. Furthermore, in discussing the waiver issue, the Court noted that in some jurisdictions waiver was possible, "when the request for counsel is equivocal. *Nash* v. *Estelle*, 597 F.2d 513 (CA5 1979) (*en banc*). *See Thompson* v. *Wainwright*, 601 F.2d 768 (CA5 1979)." *Edwards*, 451 U.S. at 486, n.9.

When specifically addressing the invocation of counsel issue, the Supreme Court did comment in *Frazier* v. *Cupp*, 394 U.S. 731, 738 (1969), that the statement, "I think I had better get a lawyer before I talk any more," might be sufficient to invoke the defendant's right to counsel under the "in any manner" language of *Miranda*, but fell short of the test under *Escobedo* v. *Illinois*, 379 U.S. 487 (1964), which controlled the case. *Frazier*, 394 U.S. at 738. Three years after *Edwards*, the Supreme Court in *Smith* v.

denied, 486 U.S. 1017 (1988); *U.S.* v. *Cherry*, 733 F.2d 1124 (5th Cir. 1984); *Thompson* v. *Wainwright*, 601 F.2d 768 (5th Cir. 1979); *Nash* v. *Estelle*, 597 F.2d 513 (5th Cir. *en banc*), *cert. denied*, 444 U.S. 981 (1979); *State* v. *Robinson*, 427 N.W.2d 217 (Minn. 1988); *State* v. *Moulds*, 105 Idaho 880, 673 P.2d 1074 (1983); *Cannady* v. *State*, 427 So.2d 723 (Fla. 1983); *State* v. *Robtoy*, 98 Wash.2d 30, 653 P.2d 284 (1982); *Daniel* v. *State*, 644 P.2d 172 (Wyo. 1982).

*Illinois*, 469 U.S. 91 (1984), acknowledged that it had not established a standard for determining the consequences of an equivocal request for counsel, and determined that it need not resolve the issue in that case.

Based on these cases, one must take a step of significant proportions to maintain that the Court's use of the phrase "clearly asserted" in *Edwards*, established or even supports the standard adopted by the majority today.

In addition to placing an improper burden on the defendant, the majority's exacting test also places an unnecessary burden on the police officer. The intent of the defendant is now to be measured through the perspective of the interrogating officer, the very person who has a substantial interest in the fruits of the interrogation. What may seem clear and unequivocal to one police officer may appear ambiguous and equivocal to another. Furthermore, his judgment will continually be subject to review by the courts. ·Courts, like police officers, may well arrive at divergent conclusions regarding the import of a suspect's references to an attorney.[3] The rule adopted by the Court today undercuts the rationale of *Miranda* and the preference expressed by the Supreme Court for establishing bright-line rules which will provide law enforcement officers with appropriate guides for responses to particular actions.

In my opinion, the record in this case supports a finding that Eaton intended to request counsel, but at a minimum, exemplifies the practical and legal dangers inherent in the majority's rule requiring an unambiguous request for counsel.

Eaton, a functional illiterate with an I.Q. between 84 and 94, was interrogated on his release from the hospital after three days of treatment for a self-inflicted gunshot wound to the head. About an hour before the interrogation began, Officers Dudley and Hottinger met with two state troopers and the Commonwealth's attorneys for the City of Salem and the County of Rockbridge. At this meeting, strategy for the interrogation of Eaton was discussed, including the fact that unrelated property charges pending in Rock-

---

[3] Compare, for example, the holding of one circuit court in this Commonwealth that a defendant invoked his right to counsel when he stated that "he might want to talk to a lawyer," *Bunch v. Commonwealth*, 225 Va. 423, 430, 304 S.E.2d 271, 275, *cert. denied*, 464 U.S. 977 (1983), with the conclusion of the trial court in this case that Eaton's statement "Maybe he ought to talk to a lawyer" was equivocal and, therefore, did not invoke his Fifth Amendment right.

ingham County had been *nolle prossed* earlier that morning, thereby releasing the attorney appointed for Eaton on those charges.[4]

At the beginning of the interrogation, Officer Dudley explained the *Miranda* warnings to Eaton, but no written explanation or waiver of rights was used. The interrogation was not tape recorded. The interview lasted approximately 45 minutes, during which time Sergeant Dudley testified, and his handwritten notes reflected, that Eaton made at least five references to an attorney including "Didn't you say I had a right to an attorney?" and, on at least two occasions, that "he ought to talk to an attorney."

After each reference to an attorney, the police officers reiterated that Eaton had a right to an attorney. Eaton remained silent. The police then reinitiated the interrogation with conversation concerning Eaton's girlfriend Judy, who was being buried that day.

At one point, after Eaton said, "Maybe I'd better talk to a lawyer," Sergeant Dudley left the room to confer with the Commonwealth's attorney concerning the implications of Eaton's reference to counsel. They decided to continue the interrogation and determine where they stood on the attorney question later. The interrogation finally concluded when Eaton again stated that he needed time to think.

On this record, Eaton's continued waiver of his rights was brought into question when he began referring to his right to counsel. As Eaton continued to refer to counsel, albeit at times in an ambiguous manner, the reactions of the police evidenced their own concern over the consequences of Eaton's statements. Yet, they took no affirmative action to remove the ambiguity and find out whether he wanted counsel. Rather, they orchestrated their actions in a manner which they believed would avoid the requirement of the presence of an attorney during the interrogation.

The rule adopted by the majority today encourages such activity, rather than encouraging police officers to determine in a straightforward manner the intent of persons in custodial interrogations regarding the exercise of their constitutional rights. That

---

[4] The trial court characterized these actions as ones which "smelled like three day old fish."

end could easily be met by a rule which requires simply asking the clarifying question, "Do you want a lawyer?".