COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Callins and Senior Judge Clements
Argued at Richmond, Virginia

ANTHONY LAMONT BROWN

                                          MEMORANDUM OPINION[*] BY
v.      Record No. 0573-23-2           JUDGE RANDOLPH A. BEALES
                                             JUNE 11, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Joseph M. Teefey, Jr., Judge[1]

(Terry Driskill; Terry Driskill Law, on brief), for appellant.
Appellant submitting on brief.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Following a jury trial, the Circuit Court of Dinwiddie County convicted Anthony Lamont

Brown of first-degree murder, aggravated malicious wounding, and two counts of using a firearm in

the commission of a felony. On appeal, Brown argues that the trial court erred in refusing to

instruct the jury on voluntary manslaughter.

## I. BACKGROUND

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the

evidence in the light most favorable to the proponent of the instruction." *Commonwealth v.*

*Vaughn*, 263 Va. 31, 33 (2002).

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable Dennis M. Martin, Sr. presided over the jury trial, and the Honorable
Joseph M. Teefey, Jr. presided at the sentencing hearing.

UNPUBLISHED

Deputy Sabrina Allgood of the Dinwiddie County Sheriff's Office testified at Brown's jury trial that on the evening of May 1, 2021, she responded to a shooting on Beth Lane in Dinwiddie County. Deputy Allgood recalled that when she arrived at the crime scene, she saw a man — who was later identified as Waekuon Johnson — lying in a ditch and suffering from a gunshot wound. She noted that there were "several people in the street and several people standing around him [Waekuon]," including an individual named Justin Pope. Deputy Allgood further testified that she recovered two firearms from Pope, which were later sent to the Department of Forensic Science for analysis. She noted that she asked the group of more than 25 bystanders whether they had seen or heard anything, but they all declined to provide any information at that time.

Adonis Jones testified that earlier that evening, he was at his house with Waekuon and a few other friends. Jones recalled that Pope (his brother) told him about a party in Dinwiddie County, which they all decided to attend. He recounted that there were a lot of people at the party and that everyone "was just in there dancing, drinking, having a good time." However, later that evening, a fight broke out while Jones and Waekuon were standing outside in front of the house. Jones testified that "a swarm of people approached me was asking me where was my brother [Pope]. I said I don't know. Because I really didn't know where he was at at the party. Then I heard somebody say F that and then they just started shooting."

Jones then described getting struck by the gunfire, saying, "I was shot and I just held my stomach like this because I got shot in my stomach. And I ran between some houses. I pulled out my phone and just called 911 laid on somebody's porch. I didn't really know whose porch I was laying on or anything." Jones did not remember what happened after the police found him on the porch, stating, "I woke up a week later in the hospital." He also described his injuries, stating, "I was shot in the elbow, in my stomach. I had to have colostomy bag." He noted that he underwent "a lot of surgeries" and that he still has "massive stomach pain. I have seizures now. I never had

- 2 -

seizures before then." Jones maintained that he did not know Brown and that he was not involved in any altercation before the shooting.

Shanellie Davis testified that she attended her sister-in-law's party on Beth Lane and saw Brown at the party that evening. She recalled that "[e]verybody was in the backyard just having a good time" when Jennifer Johnson came to the backyard and reported that Pope had just punched Monet Johnson (Pope's girlfriend and Jennifer's daughter) in the face. Davis recounted that she and the other people at the party then ran to the front yard to check on Monet. Davis was standing by the parked vehicles in the road with her friend (Cassandra Stevens) and another individual (Jamir Rivers) when she saw her son's father (Garrett Cody Bonner) telling Jones and Waekuon to leave the party. According to Davis, Jones and Waekuon "were walking backwards but facing us." She then opined, "All I know is that Waekuon -- somebody said stop and he didn't stop. And from there shots got fired." Davis testified that she heard five or six gunshots and saw Jones, Rivers, and Brown shooting at each other. She noted that Waekuon kept walking before he suddenly "just fell" as Brown fled the crime scene.

Bonner testified that he was in the backyard at the party when Monet "ran from . . . the side of the house saying that somebody hit her in the face." Bonner recalled that Monet's "face was bleeding." He testified that the people at the party then went to the front yard while he and a group of friends looked for Pope to tell him to leave. Bonner stated that when he asked Jones to find Pope and then leave, Rivers and Brown "just got to shooting out there." Bonner testified that Brown shot Waekuon after "they had a few words or whatever." He then remarked, "I left like as soon as the shots I heard like four or five shots and I started running."

Jennifer testified that she was in the back of her car tending to Monet's injuries when she heard the gunshots although she did not see anybody shooting. She recalled that she saw several people with guns that evening, including Brown and Rivers, but she denied seeing Pope or Bonner

with a gun that evening. However, in a text message exchange with Monet the next morning, Jennifer wrote that she had heard that Brown, Rivers, and Bonner had shot at Pope.

Pope testified that he attended the party with Jones, Waekuon, and two other friends. Pope remembered speaking with Monet at the party and recalled,

> She [Monet] was supposed to stay with me that night, but then some words got exchanged and pretty much she spit on me. When she spit on me I like I pushed her like get off of me. When I pushed her she hit me. When she hit me I blacked out.

Pope stated that he then walked down the street away from the party and heard gunfire, prompting him to call 911. His cousin then drove up in Pope's car, and Pope retrieved his two firearms from the vehicle. Pope testified that he then returned to the party to check on his friends and remained there until he was arrested. He denied firing a weapon that night.

Deputy Sheriff Kenneth Droddy of the Dinwiddie County Sheriff's Office testified that he was assigned to the investigation and that he interviewed Brown. Deputy Droddy recalled that after advising Brown of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Brown stated that he left the party before dark, and he denied shooting anyone. Deputy Droddy further testified that, given that Waekuon had "one gunshot wound to the middle of his back and exited to his stomach," he must have been shot "[b]ack to front" and "would have had his back to" the shooter.[2]

Investigator Steve Shifflett of the Dinwiddie County Sheriff's Office testified that he processed the evidence and took photographs of the crime scene. He recovered two cartridge casings lying next to each other in the roadway. Investigator Shifflett was also handed the two firearms recovered from Pope. After one of the police vehicles left the crime scene, Investigator Shifflett discovered three additional cartridge casings in the roadway.

_____

[2] Medical Examiner Dr. Chrystal Van Dusen testified as an expert in forensic pathology and confirmed that Waekuon died of a single gunshot wound that entered through his back "just left of the spine" and exited in his abdomen "just right of midline."

Forensic Scientist James Bullock of the Virginia Department of Forensic Science testified as an expert in firearms and tool marks. He testified that he conducted tests on the firearms recovered from Pope and the cartridge casings found at the crime scene, and he concluded that two of the cartridge casings were fired from the same gun and that the three additional cartridge casings were fired from another gun. Bullock determined that none of those five casings were fired from the guns recovered from Pope.

Following the presentation of all the evidence, Brown's counsel submitted a jury instruction on voluntary manslaughter. The trial judge denied the jury instruction, stating, "I don't see where there has been any evidence of any sort of provocation or any sort of heat of passion. That is something that the Defendant would have to raise." The jury subsequently convicted Brown of first-degree murder, aggravated malicious wounding, and two counts of using a firearm in the commission of a felony. Brown now appeals the trial court's denial of his submitted jury instruction on voluntary manslaughter.

## II. ANALYSIS

On appeal to this Court, Brown argues, "The trial court erred by denying a jury instruction for voluntary manslaughter where there was evidence of sufficient provocation to preclude malice on the part of the appellant." He contends that the "factors presented during the Commonwealth's case in chief" at trial "amount to far more than a mere scintilla of evidence," thereby warranting a jury instruction on voluntary manslaughter. Specifically, he points to "[t]he appearance of a female family member who had been wounded, a search in the dark by a group of people for the assailant, multiple shots fired by multiple firearms and two persons struck by bullets" as the "scintilla of evidence" supporting his proposed jury instruction on voluntary manslaughter.

The Supreme Court has stated, "As a general rule, the matter of granting and denying instructions does rest in the sound discretion of the trial court." *Cooper v. Commonwealth*, 277

Va. 377, 381 (2009). As this Court has consistently held, "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Witherow v. Commonwealth*, 65 Va. App. 557, 565 (2015) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (*en banc*)). "Instructions are to be read in connection with the evidence to which they are intended to apply." *Chapman v. Commonwealth*, 56 Va. App. 725, 736 (2010) (quoting *Carroll v. Hutchinson*, 172 Va. 43, 52 (1939)). "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by evidence." *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990) (quoting *Frye v. Commonwealth*, 231 Va. 370, 388 (1986)). "Although an instruction correctly states the law, if it is not applicable to the facts and circumstances of the case, it should not be given. An instruction must be supported by more than a scintilla of evidence." *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (quoting *Hatcher v. Commonwealth*, 218 Va. 811, 813-14 (1978)).

This Court has defined "voluntary manslaughter" as "the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Dandridge v. Commonwealth*, 72 Va. App. 669, 681-82 (2021) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). *See also Turner v. Commonwealth*, 23 Va. App. 270, 274 (1996), *aff'd*, 255 Va. 1 (1997) (defining "voluntary manslaughter" as "an intentional killing committed while in the sudden heat of passion upon reasonable provocation"). Unlike murder, voluntary manslaughter occurs in the absence of malice. *Barrett v. Commonwealth*, 231 Va. 102, 105 (1986). This Court has been clear that "[w]ords alone, no matter how insulting, are never sufficient to constitute heat of passion" that would reduce a murder to voluntary manslaughter. *Rhodes v. Commonwealth*, 41 Va. App. 195, 201 (2003).

Here, for Brown to have been entitled to an instruction on voluntary manslaughter, the evidence would have had to have supported a conclusion that he intentionally killed Waekuon as a result of heat of passion engendered by a provocation from something more than a mere exchange of words. *See Mayberry v. Commonwealth*, 66 Va. App. 93, 101 (2016).

Davis testified at trial that Waekuon was not involved with Pope's assault on Monet or in the ensuing search for Pope. Pope testified that he had already left the party and was down the street when the shooting occurred. Davis further testified that Waekuon was backing away when Brown and Rivers started shooting, and the medical examiner confirmed that Waekuon was shot in the back. There is no evidence in the record that Waekuon argued with Brown, threatened Brown, fought with Brown, or otherwise engaged Brown in any way other than "somebody said stop and he [Waekuon] didn't stop. And from there shots got fired." Simply put, there was not a scintilla of evidence presented at trial supporting a jury instruction on voluntary manslaughter as there were no facts in the record suggesting that Brown acted in the heat of passion under any provocation by Waekuon. Consequently, we certainly cannot say that the trial court erred in refusing to give Brown's requested jury instruction on voluntary manslaughter.

## III. CONCLUSION

In short, the trial court did not err in refusing to instruct the jury on voluntary manslaughter because there was not a scintilla of evidence that Brown acted in the sudden heat of passion upon reasonable provocation. Therefore, for all of the foregoing reasons, we affirm the trial court's judgment and uphold Brown's convictions.

*Affirmed.*