COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Bumgardner
Argued at Alexandria, Virginia


RODRICK MARCELL HENDERSON, S/K/A
  RODERICK HENDERSON
                                              MEMORANDUM OPINION* BY
v.         Record No. 0653-05-4               RUDOLPH BUMGARDNER, III
                                                      MAY 30, 2006
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                          Thomas A. Fortkort, Judge Designate

                Kevin T. Gaynor, Assistant Public Defender (Office of the Public
                Defender, on brief), for appellant.

                Karen Misbach, Assistant Attorney General (Judith Williams
                Jagdmann, Attorney General; Richard B. Smith, Senior Assistant
                Attorney General, on brief), for appellee.


       Rodrick M. Henderson appeals his conviction at a bench trial of statutory burglary and

petit larceny.  He maintains the trial court erred when it overruled his motion to suppress a letter

of apology that he wrote after his interrogation by police.  We hold the trial court properly

admitted the writing, and affirm the convictions.

       "On appeal from a denial of a suppression motion, we view the evidence in the light most

favorable to the Commonwealth."  Mitchell v. Commonwealth, 30 Va. App. 520, 526, 518

S.E.2d 330, 333 (1999).  During the investigation of a burglary at a laundromat, police found the

defendant's fingerprints on the interior of a cabinet that the owner kept locked inside his office.

Four months later, patrol officers arrested the defendant on a warrant for that offense.  They took

---

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

him to the police department where the detective assigned to the case and one other officer interviewed him.

The detective read, and the defendant signed, a form indicating the police had advised defendant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and he desired to waive his rights and make a statement. The detective then began a discussion of the defendant's previous arrests and drug problems. He told the defendant about discovering his fingerprints in the office of the laundromat and asked the defendant if he did the crime because of his drug problem. At that point the defendant stated, "You obviously know why I did it," and asked why the detective wanted a further statement.

The defendant then advised he would not make a statement or a taped statement. To clarify whether the defendant was refusing to make any type of statement at all, the detective asked the defendant if he wanted to write a letter of apology to the laundromat owner. The defendant said he thought he should talk to his attorney first, but after that he would be happy to give a statement. The detective responded that was fine but assured the defendant that once he talked to his attorney, the next time the officer would see the defendant would be in court. The detective terminated the interview and began packing up his materials, including the tape recorder that he had never turned on.

As the detective and the other officer were stepping out of the interview room, the defendant said, "Hey, maybe I'll make the letter of apology." The detective gave him paper and pen. Both officers left the defendant alone in the room.

After about ten minutes, the detective returned. The defendant had written a letter that he gave to the detective to read. It contained grammatical and spelling errors. The detective asked if the defendant wanted help in correcting them. He did, so the detective rewrote the letter from

the original.  After reading it, the defendant signed it.  The letter was admitted into evidence at the defendant's trial over his objection.

The parties do not dispute the law that applies to this case.  "[C]ustodial interrogation [by the police] must cease [] when the accused, having received <u>Miranda</u> warnings and having begun to respond to the questions of the authorities, 'has *clearly* asserted his right to counsel.'"  <u>Eaton v. Commonwealth</u>, 240 Va. 236, 253-54, 397 S.E.2d 385, 395-96 (1990) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981)).  Once the right to counsel is invoked, "all interrogation must cease until counsel is present, or until the accused initiates further discussion or interrogation."  <u>Giles v. Commonwealth</u>, 28 Va. App. 527, 531, 507 S.E.2d 102, 104 (1998).  In order to reinitiate discussion with the police, the accused must have "evinced a willingness and a desire for a generalized discussion about the investigation . . . ."  <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045-46 (1983).

The parties do dispute the facts that arise from the evidence presented.  The trial judge issued a written memorandum overruling the motion to suppress.  She found the detective did not interrogate the defendant by asking if he wanted to write an apology.  She found the detective honored the defendant's request to speak to an attorney and terminated the interrogation.  The trial judge found the detective's statement that the next time the defendant would see him would be in court was not interrogation or a threat that failure to make a statement would jeopardize the defendant's position.  Finally, the trial judge found the defendant spontaneously initiated further communication as the detective was leaving by saying that he would write a letter of apology and that the detective did not begin further questioning but merely handed the defendant paper and pen as he left the room.

An appellate court reviews the trial court's "findings of historical fact only for clear error and must give deference to the inferences that may be drawn from those factual findings."

<u>Commonwealth v. Hilliard</u>, 270 Va. 42, 49-50, 613 S.E.2d 579, 584 (2005). The record of evidence presented at the suppression hearing and the trial support the findings of fact made by the trial court.

In this case the police detective ended the interview, collected his materials, and was partly out of the door when the defendant stated, "Hey, maybe I'll make the letter of apology." The defendant's statement "evinced a willingness and a desire for a generalized discussion." <u>See</u> <u>Bradshaw</u>, 462 U.S. at 1045-46. However, the police did not recommence their interrogation. The detective gave the defendant paper and pen, and left the room. The defendant wrote his letter of apology while he was alone in the room. When the detective returned, the defendant handed the letter to the detective and even accepted help in rewriting it. Thus, as the trial judge found, the letter was not obtained by the police through a procedure that violated the defendant's constitutional rights.

We hold that the defendant's letter of apology was admissible, and affirm the trial court's denial of the motion to suppress.

<u>Affirmed.</u>

Benton, J., dissenting.

Roderick Henderson contends the police officers obtained statements from him in violation of his Fifth and Sixth Amendment rights after he invoked his right to remain silent and his right to counsel. Henderson's Sixth Amendment right to counsel was not violated because "adversarial judicial criminal proceedings" had not yet been initiated. See United States v. Gouveia, 467 U.S. 180, 190 (1984) (noting that the Supreme Court has "never held that the [Sixth Amendment] right to counsel attaches at the time of arrest"). I would hold, however, that Henderson's Fifth Amendment rights were violated and that the trial judge's denial of his motion to suppress his confession was reversible error. Therefore, I would reverse Henderson's convictions for statutory burglary and petit larceny.

I.

On September 7, 2003, someone pried open doors at a laundromat in Alexandria, Virginia and stole money from the office. During the investigation, the police officers found two fingerprints on the inside of a cabinet that later were determined to be Roderick Henderson's fingerprints.

Detective Jeffrey Stovall arrested Henderson and sought to interview Henderson in the presence of Officer Kevin Thomas. At the hearing on the motion to suppress, Detective Stovall testified that he began the interview by reading Henderson Miranda rights. After Henderson signed a form waiving these rights, Detective Stovall told Henderson that the police found his fingerprints inside the laundromat and asked Henderson if he burgled the laundromat because of his drug problem. According to the detective, Henderson said "if [the detectives] know why he did it, why did he need for [the detective] to hear him say he did it." Later, at trial, the detective said Henderson's response was, "[y]ou obviously know why I did it." Detective Stovall testified that he then questioned Henderson to determine "is he saying he did the burglary and so forth

due to his drug problem or he was trying to clarify the situation." Henderson responded by asking the detective questions about the incident. The detective testified that after he answered Henderson's questions, Henderson said "he did not want to make a statement . . . nor did he want to make a taped statement." Although a recording device was on the table, the detective never activated it while questioning Henderson.

Rather than cease his questioning, the detective sought to "clarify" what Henderson intended. He testified that he then "offered [to have Henderson write] a letter of apology," explaining that he wanted to determine if Henderson "would . . . prefer to do that." The detective testified Henderson said he "thought he may talk to an attorney." Detective Stovall then began packing his things to leave the interview and told Henderson "that was fine." Detective Stovall also said to Henderson, "[t]he next time [he] would see [Henderson] would be in court," and he "assured [Henderson] that he would not be making a statement once he talked to his attorney."

In response to questioning from the judge, Detective Stovall said it may have taken him ten minutes to pack up his belongings to leave, but on further questioning by the prosecutor he said it could have been as short as a minute or two. Detective Stovall testified that as he delivered his verbal warning and was about to leave the room, Henderson said, "maybe I'll make the letter of apology." Detective Stovall then gave Henderson paper and a pen and left the room without giving Henderson guidance as to what to write. Detective Stovall returned ten minutes later and offered to help Henderson rewrite the letter of apology. He testified that he made this offer to improve Henderson's spelling and grammar. When the detective finished the revised apology, Henderson read and signed it. Detective Stovall filled out a property inventory sheet and put the apology in his file for use in prosecuting Henderson.

Denying the motion to suppress, the trial judge ruled as follows:

> Based on the evidence presented, the Court finds that the
> detective did not violate the defendant's constitutional right to

remain silent by asking the defendant whether he would like to write a letter of apology after the defendant said he did not want to make a statement or a taped statement. The detective did not interrogate the defendant further about the burglary under investigation. The defendant stated that he would make a statement but that he wanted to first talk to his attorney. This was a clear indication by the defendant that he intended to invoke his right to counsel and the detective interpreted it as such. The detective honored the defendant's desire to talk with a lawyer before making a statement and terminated the interview. The detective's statement, "that's fine," and telling the defendant that once he had a lawyer the next time he would see the defendant would be in court did not, in the Court's opinion, constitute continued interrogation, nor did it constitute a threat to the defendant that he was jeopardizing his position by not making a statement. When the defendant spontaneously said to the detective as he was leaving the interview that maybe he would write a letter of apology, the defendant initiated further communication with the detective. In response, the detective did not begin questioning the defendant anew, but merely handed him a piece of paper and a pen and left the room. Under these circumstances, the Court finds that the defendant waived his right to counsel.

## II.

The self-incrimination clause contained in the Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To implement this protection, procedural safeguards have been established to ensure that an individual in custody is appraised of his rights of silence and to an attorney and to guarantee that those rights are "scrupulously honored." Miranda v. Arizona, 384 U.S. 436, 479 (1966). Simply put,

> [o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation

operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

Id. at 473-74 (footnote omitted).

Applying the high standards set for waiver of constitutional rights, the Supreme Court has held that "if the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475.

> A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." [Miranda,] 384 U.S., at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id., at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

Michigan v. Mosley, 423 U.S. 96, 103-04 (1975) (emphasis added).

Detective Stovall testified that "Henderson advised that he didn't want to make a statement at that time." Nothing was ambiguous about Henderson's refusal to make a statement. He told the detective "he did not want to make a statement . . . nor did he want to make a taped statement." A reasonable police officer investigating a crime would have understood this to mean that Henderson invoked his right to remain silent. Despite Henderson's unequivocal request, Detective Stovall continued to question Henderson under the guise of determining whether Henderson would like to write a letter of apology to the owner of the laundromat. Thus, not only did Detective Stovall not immediately cease questioning Henderson, he embarked upon

a ploy to cause Henderson to incriminate himself through an "apology" to the owner of the burgled establishment.

The Supreme Court has held that the functional equivalent of questioning may violate a suspect's Fifth Amendment rights.

> [T]he <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

<u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). The Supreme Court emphasized that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Id.</u> at 301.

The record does not support the trial judge's finding that the detective's inquiry about an "apology" was not further interrogation. Detective Stovall obviously knew or should have known that his offer to permit Henderson to write a letter of apology to the owner was designed to move Henderson "to make a self-incriminating response." <u>Id.</u> at 303. By definition, an apology is "something said or written in defense or justification of what appears to others to be wrong or of what may be liable to disapprobation." <u>Webster's Third New International Dictionary</u> 101 (1993). It is inherently a confession, and not made less so because it is intended as an atonement. Detective Stovall's request was no more than an artfully disguised way of extracting in a letter of apology a confession to circumvent Henderson's Fifth Amendment rights. To say that Detective Stovall's requests that Henderson write a letter of apology did not amount to not continued interrogation would render the protections afforded by <u>Miranda</u> and <u>Innis</u> nugatory. The detective's conduct plainly violated Henderson's Fifth Amendment right to silence.

III.

The trial judge found that when Henderson "stated that he would make a statement but he wanted to first talk to an attorney . . . [, this] was a clear indication by [Henderson] that he intended to invoke his right to counsel and the detective interpreted it as such." One of the constitutional safeguards established by Miranda is the right of an accused person to have an attorney present at a custodial interrogation and to end the interrogation by invoking this right. 384 U.S. at 469, 474-75.

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

Id. at 474. The "'relatively rigid requirement that interrogation must cease upon the accused's request for an attorney has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogations are not admissible.'" Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Fare v. Michael C., 442 U.S. 707, 718 (1979)). Thus, the Supreme Court has held that "the rigid rule [of Miranda means] that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights." Fare, 442 U.S. at 719. If, in violation of these rights, "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475 (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14 (1964)).

The evidence proved that the detective then reinitiated further exchanges and conversations with Henderson. When Henderson told Detective Stovall that he wished to see a

- 10 -

lawyer, Detective Stovall then told Henderson "that was fine" and that "[t]he next time [he] would see [Henderson] would be in court." He continued by "assur[ing] [Henderson] that he would not be making a statement once [Henderson] talked to his attorney." These comments were an initiation of dialogue with Henderson after he had invoked both his right to silence and his right to counsel. This was a violation of the rule established in Edwards v. Arizona, 451 U.S. 477 (1981), where the Supreme Court explained as follows:

> [A]lthough we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85 (citation and footnote omitted). "Edwards established a bright-line rule to safeguard pre-existing rights." Solem v. Stumes, 465 U.S. 638, 646 (1984). The trial judge's finding that Henderson "initiated further conversation with the detective" ignores the evidence which shows that the police failed to "scrupulously honor" Henderson's request to remain silent and his request for a lawyer.

Furthermore, noting that the Edwards rule has been misapprehended, the Supreme Court of the United States later explained its ruling as follows:

> We did not there hold that the "initiation" of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." This was in effect a prophylactic rule, designed to

protect an accused in police custody from being badgered by police officers in the manner in which the defendant in <u>Edwards</u> was . . . .

But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation . . . .

\*    \*    \*    \*    \*    \*    \*

Thus, the . . . Court of Appeals was wrong in thinking that an "initiation" of a conversation or discussion by an accused not only satisfied the <u>Edwards</u> rule, but *exproprio vigore* sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together.

<u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044-45 (1983) (citations omitted).

[T]he prophylactic protections that the <u>Miranda</u> warnings provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," 384 U.S., at 467, are implemented by the application of the <u>Edwards</u> corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect. As JUSTICE WHITE has explained, "the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." <u>Michigan v. Mosley</u>, 423 U.S. 96, 110, n.2 (1975) (concurring in result).

<u>Roberson</u>, 486 U.S. at 681-82.

The detective's statements to Henderson that Henderson would next see the detective in Court was a threat of prosecution for exercising his right and a patent invitation to continue the dialogue. The detective's continued statements of "assur[ance]" to Henderson about the

- 12 -

statements Henderson declined to give violated the <u>Edwards</u> rule.  The record in this case failed to demonstrate that Henderson waived his previously asserted right to counsel.

For these reasons, I would hold that the trial judge erred in refusing to suppress Henderson's confession, and I would reverse the convictions.