COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Raphael and White

ROBERT JAY SMITH

v.      Record No. 1789-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*]
PER CURIAM
OCTOBER 22, 2024

FROM THE CIRCUIT COURT OF FLUVANNA COUNTY
David M. Barredo, Judge[1]

(Bernadette M. Donovan; Donovan & Engle, PLLC, on briefs), for
appellant.

(Jason S. Miyares, Attorney General; Justin B. Hill, Assistant
Attorney General, on brief), for appellee.

Robert J. Smith was convicted of rape of a child who was under the age of 13 (Code

§ 18.2-61(A)(iii)) and aggravated sexual battery of a child who was under the age of 13 (Code

§ 18.2-67.3) following a two-day jury trial.[2] After the conviction on August 12, 2022, Smith

retained new counsel for sentencing and post-conviction motions. Smith filed a motion for a new

trial on July 31, 2023, almost one year after the convictions, which set forth ten allegations of error.

After a lengthy hearing, the trial court denied the motion and sentenced Smith to consecutive

sentences of life in prison on the rape conviction and 20 years of incarceration on the aggravated

sexual battery conviction.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable David Barredo presided over the post-conviction motion and sentencing.

[2] The Honorable Claude Worrell, II presided over the two-day jury trial.

In his appeal, Smith alleges that the trial court erred in denying the motion for a new trial on the grounds that he was denied the right to conflict-free counsel. He also contends that the trial court erred in denying the motion for a new trial because he alleges that his constitutional rights were violated by evidence presented of aggravated sexual battery that permitted a non-unanimous jury verdict. Finally, Smith asserts that the trial court erred in denying the motion because a juror allegedly lied during voir dire, necessitating a new trial. Having examined the briefs and the record in this case, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit." *See* Code § 17.1-403(ii)(a); Rule 5A:27(a). In addition, "the dispositive issue or issues have been authoritatively decided," and Smith "has not argued that the case law should be overturned, extended, modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b). We affirm the convictions.

BACKGROUND

This Court reviews the evidence in "the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). We "regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020).

In the summer of 2015, R.H.[3] was seven years old, turning eight in August. R.H.'s parents were divorced. R.H. lived with his father, Jason Howell in Fluvanna while his mother Candice lived in Greene County. During that summer and fall, Howell worked with Smith at Commonwealth Interiors and spent time together "just about every day" or "every day" outside of work. Smith gave Howell rides to and from work. Their friendship included a mutual struggle with

_____

[3] The victim, R.H., was assigned female at birth and presented female at the time of the offenses. His preferred name and pronouns, however, of he/him were used throughout the trial and will be used in this opinion. Initials are used to protect the identity of the minor.

alcohol. Howell said that Smith was the only friend who came over every day. The visits continued until they had a disagreement because Smith refused to leave Howell's house in December 2018, resulting in a physical confrontation.

Howell testified that he did not see Smith again until April 2019 when he attended Smith's wedding. When Howell returned home from the wedding, R.H. was "very upset" that Howell had attended the event and cried when he saw photographs of Smith and Howell hugging.

Howell related that there were times Smith was alone with R.H. inside the house when Howell was doing yard work during the summer of 2015. He described unusual behavior from R.H. that summer, including R.H. choosing to move from the larger bedroom he shared with his sister to the smaller one.

R.H. testified that Smith was at their house consistently throughout the summer of 2015, but less so, although often, in the following months. He acknowledged that Howell had a "drinking problem" and observed that Smith did too. R.H.'s interactions with Smith were different than those with Howell's other friends, as Smith's behavior was described as "more touchy, gift giving, talking more, [and] trying to get closer."

R.H. became uncomfortable with the conversations he had with Smith, starting before the summer of 2015. One of the first incidents was when Smith told R.H. that "he preferred [R.H.] over his . . . girlfriend." In addition, Smith's "hugs [of R.H.] were longer," and he would "get too close behind" R.H. when the child was alone with him. R.H. never saw Smith interact with his sister in the same way, and none of Howell's other friends behaved like that towards him. Smith's behavior escalated before the summer of 2015 when he "came up behind" [R.H.] while he was sitting on the couch and . . . "stood there, holding [R.H.'s] shoulders." In another incident, Smith removed R.H.'s underwear and had him "sit on his lap" for "ten, fifteen minutes." Smith touched R.H. "underneath [his] skirt and [his] chest area," "skin on skin."

Once, Smith entered R.H.'s bedroom, sat on the bed next to him after "push[ing] a hole into" his "stuffed animals with his foot," and put his hand up R.H.'s dress. R.H. described the dress as "[his] favorite," a "pink, purple, and blue sundress" with an elastic top that "flowed from the bottom." R.H. "realized something was wrong" when Smith moved to face him and "went underneath [his] dress." Smith touched "[R.H.'s] genitalia," "took off [his]underwear," then "slid his hands up underneath the elastic of [the] dress and pushed [R H.] down" onto his back. Smith began "touching [R.H.'s] genitalia," then "flipped [R.H.] onto [his] stomach and balled the dress up underneath [him]." R.H. said that Smith "pressed [his] head" into a "frog pillow pet," one of the stuffed animals R.H. kept on his bed. After feeling R.H. "everywhere," Smith "dropped his pants and inserted himself into [R.H.]." R.H. described feeling "terrified," and the specific act "disgusting, painful," and said he was "yelling, crying." The assault ended when Smith "pulled out and [] ejaculated on [R.H.'s] back," then pulled up his pants and left.

From the attack, R.H. suffered two large bruises on his shoulders where Smith had "dug his palms in," as well as bruises on his inner thighs. He said that his vagina hurt afterwards and that he contracted a urinary tract infection as a result. At trial, R.H. identified the "fluffy Tinker Bell comforter" and the "pillow pet" from his bed. He said that he told no one because "[he] thought either [he] or the people [he] would tell would be hurt [by Smith] if [he] told." Following the assault, R.H. tried to cope with the trauma through art and self-harming behaviors. He described cutting himself shallowly on his thighs and arms so that the cuts would heal without scarring and trying to overdose with drugs.

Yet another incident occurred on the "trails beside [R.H.'s] dad's house." The trails were used for "riding bikes, walking, [and] looking for bugs." R.H. testified that "before [his] eighth birthday," Smith asked him to "come outside and take a walk." They went "to the part of the trail where the trees were the thickest," and Smith "[took] his pants down and [guided] R.H.'s

hand to touch his penis." R.H. said that "[Smith] made [him] rub it, essentially." The incident ended when "[Smith] ejaculated . . . on [R.H.'s] shoulder," then returned to the house. When asked why he told no one, R.H. testified that "[he] was scared" because Smith had threatened him. Although he could not remember any specifics, he remembered that he was terrified, and thought that he would get hurt or not be believed if he reported the abuse.

R.H. first disclosed the assault to his boyfriend a few years later. Thereafter, he told Howell about what happened by writing him two separate notes, followed by several conversations. Howell reported the incidents to law enforcement in 2021, leading to the investigation and ensuing indictments.

On the first day of trial, the panel was selected from a pool of 46 potential jurors. As voir dire proceeded, counsel for Smith asked first whether anyone on the panel was employed or had been employed as law enforcement officers. All responded in the negative. His second question was whether "any of [their] relatives or close personal friends [were law enforcement]." Nine responded affirmatively, including Juror 7 who stated in a straightforward exchange: "[m]y husband, but it was many, many years ago before we were married, he was a policeman in San Francisco." Counsel replied, "[o]kay. Nothing recent?" She replied "no." In response to other jurors, counsel either thanked them for the response or followed up with a question regarding whether the relationship would affect their judgment. Trial counsel's final question was whether anyone would "tend to believe the testimony of the law enforcement officer over the testimony of the civilian? Just because the witness was a law enforcement officer." All jurors responded in the negative. Two jurors from that line of questioning were stricken for cause; three were dismissed on preemptory strikes; and the other four were seated on the panel.

At the close of the trial, the court reviewed the jury instructions with counsel. One instruction outlined the elements of aggravated sexual battery; another instruction defined the

elements of rape. The verdict forms were for one count each of aggravated sexual battery and rape. The court read the instructions to the jury, advised it of the Commonwealth's burden to prove each element beyond a reasonable doubt for the offenses, and directed that the verdict must be unanimous. The jury returned guilty verdicts on both charges. Smith's counsel requested that the jury be polled; each juror affirmed the verdict.

Once the jury was dismissed and the trial court pronounced that the evidence was sufficient to support the verdicts, Smith's counsel moved to set aside the verdict. Finding no basis in fact or in law to set aside, the motion was denied.

Smith retained substitute counsel for sentencing and post-conviction matters. Counsel argued ten claims in Smith's motion for a new trial. Among the claims and relevant to this appeal are three allegations of error. First, Smith asserted that his trial counsel had a conflict of interest in representing him leading to a violation of his Sixth Amendment rights. Second, he alleged that the manner in which the evidence was presented permitted an unconstitutional non-unanimous conviction of aggravated sexual battery. Finally, he claimed that Juror 7 lied during voir dire necessitating a new trial.

The trial court denied the motion and sentenced Smith to incarceration for life on the rape conviction and 20 years on the aggravated sexual battery conviction. This appeal followed.

ANALYSIS

The Court applies an abuse of discretion standard of review when reviewing a trial court's denial of a motion for a new trial. *Avent v. Commonwealth*, 279 Va. 175, 204 (2010).

I. Right to Conflict-free Counsel

As he claimed for the first time in his motion to set aside the verdict, Smith asserts on appeal that his trial counsel had a conflict of interest because he had represented Howell, the victim's father, in a driving under the influence case in 2007. Smith argues that, because of the

conflict of interest, trial counsel "failed to meaningfully cross-examine [Howell] or confront [the] child's accusations." However, following the jury trial, Smith acknowledged that his trial counsel had informed him of the prior representation, but, nonetheless, that Smith had continued with trial counsel.

To establish a Sixth Amendment violation, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "The possibility of conflict is insufficient to impugn a criminal conviction." *Id.* at 350. "An actual conflict of interest exists when an attorney engages in wrongful conduct related to the client's trial." *Carter v. Commonwealth*, 16 Va. App. 42, 47 (1993) (quoting *United States v. Jones*, 900 F.2d 512, 519 (1990)). "The burden of establishing an alleged conflict of interest between an attorney and his client is upon the person who asserts such a conflict." *Turner v. Commonwealth*, 259 Va. 816, 819 (2000).

Smith fails to meet the burden of establishing that there was a conflict of interest between Smith and his trial counsel. Counsel's representation of the victim's father, Howell, occurred in 2007, some 15 years before the jury trial. In fact, trial counsel had "absolutely no recollection" of the earlier case. Furthermore, when trial counsel disclosed the previous representation, Smith chose to continue with him as retained counsel.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court cautioned against second-guessing counsel's representation through hindsight. *Id.* at 690. Smith's appeal does just that: after suffering two convictions, he second-guesses trial counsel's decisions about trial strategy, management, and performance. Challenging trial counsel's performance in cross-

examination is more properly characterized as alleging that Smith had ineffective assistance of counsel.[4]

The sentencing court correctly opined that ineffective assistance of counsel was "not one of the any other reasons for which the court can grant a new trial at this stage." Here, as in *Turner*, the "court ruled correctly that the issue raised by [Smith's] claim of the ineffective assistance of counsel should be decided in habeas corpus proceedings." *Turner*, 259 Va. at 821. Accordingly, we find no error in the trial court's ruling concerning the alleged conflict of interest claim.

II. Non-unanimous Verdict on Aggravated Sexual Battery

Also presented first in his motion for a new trial, Smith argues that the Commonwealth's evidence, if believed, presented two instances of aggravated sexual battery. He asserts that the failure of the Commonwealth to elect which instance the indictment was based upon—and the single instance that the conviction was supported by—permitted the jury to reach a non-unanimous verdict. Smith did not comply with Rule 3A:9 and never challenged the non-specific written indictment. Smith, at no time before trial, requested an election by the Commonwealth by asking for a bill of particulars. Nor did Smith, during trial, ask for a particularized jury instruction to be given or a special verdict form to be used.

Citing numerous cases decided in other jurisdictions, Smith urges this Court to reverse the trial court's denial of his motion for a new trial. However, in nearly every case relied upon, the foreign appellate courts were faced with appellants who had raised the issue at some point in the trial court before or during the trial proceeding. Some requested a bill of particulars; some filed challenges to the duplicity allowed by the indictment; some moved to quash the indictment;

---

[4] Smith's motion for a new trial presented several claims alleging ineffective assistance of counsel which were not included in the appeal.

- 8 -

some requested a special verdict form. Other cases clearly relied upon established foreign jurisdiction case law to find plain error. In fact, in one case, the error analysis involved a determination of whether the defense was a unified one or one particular to each alleged instance, a review mandated by case law of that jurisdiction.[5]

Appellate jurisdiction in the Commonwealth, and its limitation, is enshrined in the Rules of the Supreme Court of Virginia. These "are rules and not suggestions; we expect litigants before this Court to abide by them." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Eaton v. Wash. Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 320 n.1 (2016)). Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless . . . stated with reasonable certainty at the time of the ruling." This rule "applies to bar even constitutional claims." *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (quoting *Ohree v. Commonwealth*, 26 Va. App 299, 308 (1998). "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015).

Smith had at least three opportunities before the jury verdict to address the issue he now raises. He availed himself of none of them. He never challenged the wording of the indictment, which he could have done pursuant to Rule 3A:9; he never moved for a bill of particulars, where he could have requested specific dates or conduct alleged to be the basis of the prosecution; he never requested a particularized jury instruction or special verdict form. Further, it must be said that he never raised the issue in any way until well after the jury trial was concluded–certainly

_____

[5] Cited cases included *State v. Patch*, 599 A.2d 1243 (N.H. 1991); *State v. Saluter*, 715 A.2d 1250 (R.I. 1998); *Woertman v. People*, 804 P.2d 188 (Colo. 1991); *United States v. Karam*, 37 F.3d 1280 (8th Cir. 1994); and *State v. Voyles*, 160 P.3d 794 (Kan. 2007).

not when the trial court had a "fair opportunity to resolve the issue at trial." *Id.* Smith's argument is barred on appeal.

III. Juror Misconduct

Finally, as a basis for his argument that the trial court erred in denying his motion, Smith challenges the impartiality of the jury, specifically contending that Juror 7 was dishonest because she did not spontaneously offer additional information in response to trial counsel's limited questions about a relationship with law enforcement. Smith argues that post-conviction, new counsel found information on the internet about Juror 7's husband, who worked as a consultant and salesman for firms with ties to law enforcement. Based upon this information, Smith asserted that Juror 7 lied during voir dire.

Nine potential jurors responded affirmatively to trial counsel's voir dire regarding relatives or close friends who worked in law enforcement. Juror 7 truthfully disclosed that her husband was a police officer years ago in San Francisco. Juror 7 again answered truthfully in response to trial counsel's only subsequent question, "[n]othing recent?" stating "no." The record reflects that trial counsel did not ask any juror about business ties to law enforcement. Juror 7 stated that her husband's previous employment would not make her more likely to believe the testimony of a police officer over any other witness and that she would be fair and impartial in considering the evidence.[6]

The Sixth Amendment of the Constitution of the United States, made available to the states through the Fourteenth Amendment, provides that the accused is entitled to an impartial jury at trial. In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Court articulated a two-prong conjunctive test for determining whether an allegation of juror

---

[6] Smith does not challenge the impartiality of the dismissals for cause and preemptive strikes for the other jurors; four of the jurors who responded that they knew law enforcement were empaneled.

dishonesty necessitated a new trial. The Court held that "a litigant must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Blevins v. Commonwealth*, 267 Va. 291, 296-97 (2004). The Court further observed that a litigant is "'entitled to a fair trial but not perfect a one,' for there are no perfect trials." *McDonough*, 464 U.S. at 553 (quoting *Brown v. United States*, 411 U.S. 223, 231-32 (1973)). "An appellate court must give deference to a trial court's factual finding regarding a juror's impartiality because the trial court 'sees and hears the juror.'" *Blevins*, 267 Va. at 297 (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)). There must be a "showing of manifest error" for the appellate court to reverse the trial court based on juror impartiality. *Id.* (quoting *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)).

Smith's argument fails the first prong of the *McDonough* test: Juror 7 honestly answered the voir dire question posed by trial counsel. The second prong analysis, therefore, is unnecessary. The trial court stated that the juror "did honestly answer [trial counsel's question] by stating, yes, my husband was, several years ago." The record supports the trial court's denial of Smith's motion for a new trial on the grounds of juror bias, and we do not disturb it.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

- 11 -